UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

ARTHUR STEINBERG, AS RECEIVER OF SAGAM   )
CAPITAL MANAGEMENT CORP., SAGAM CAPITAL   )
LLC,  and SAGAM CORP.,   )
   )  Civil Action No.
   )  Hon. Alvin K. Hellerstein
Plaintiff,   )
   )
v.   )
   )  **COMPLAINT**
MENACHEM IVCHER, JENNIFER IVCHER, SAGIV   )
SHIV, AL MANAGEMENT CORP., ECLECTIC   )
HOLDINGS INC., SYDNEY PLASTICS, INC., and   )
AMERIPACKAGING INC.,   )
   )
Defendants.   )

------------------------------------------------------------------ x

**05 CV    5482**

RECEIVED
JUN 09 2005
U.S.D.C. S.D. N.Y.
CASHIERS

      Plaintiff Arthur Steinberg, the Court-appointed receiver ("Receiver") for Sagam

Capital Management Corp. f/k/a Sagam Management Corp. ("Sagam Management"), Sagam

Capital LLC ("Sagam Capital") and Sagam Corp. (together with Sagam Management and Sagam

Capital, the "Sagam Entities"), by his attorneys Kaye Scholer LLP, as and for his complaint

against Menachem Ivcher ("Menachem" or "Menachem Ivcher"), Jennifer Ivcher a/k/a Jennifer

Ivcher Klainbaum ("Jennifer" or "Jennifer Ivcher"), Sagiv Shiv ("Sagiv" or "Sagiv Shiv"), AL

Management Corp. ("AL Management"), Eclectic Holdings Inc. ("Eclectic"), Sydney Plastics,

Inc. ("Sydney Plastics") and AmeriPackaging Inc. ("Ameripackaging"), alleges as follows:

## THE PARTIES

    1.      On December 10, 2001, the Securities and Exchange Commission (the

"SEC") commenced an action in this Court against Yehuda Shiv ("Shiv" or "Yehuda Shiv"),

Sagam Management and Sagam Capital in the action styled as *Securities and Exchange*

*Commission v. Yehuda Shiv, Sagam Capital Management Corp. and Sagam Capital LLC*, Civ.

Action No. 01 CV 11282 (Hellerstein, J.) (the "SEC Action").

2.     On December 10, 2001, the Court entered an order (the "Injunction

Order") in the SEC Action which provided, among other relief, for the appointment of a receiver

to administer the estates of Sagam.  By Order of this Court dated December 12, 2001, Arthur

Steinberg was appointed as the Receiver for Sagam Management and Sagam Capital.  By Order

of this Court dated April 30, 2004, Arthur Steinberg was appointed as the Receiver for Sagam

Corp.  By virtue of the Receiver's settlement with Shiv, the Receiver acquired Shiv's interests in

Flame Corp. ("Flame").  Shiv was a 100% shareholder of Flame.

3.     Among other things, the Receiver is responsible for administering the

estate and assets of the Sagam Entities as well as Shiv's interests in Flame (the "Receivership

Estate").  The Receiver maintains an office for the conduct of business at 425 Park Avenue, New

York, New York and he is a New Jersey resident.

4.     Defendant Menachem Ivcher was at all times relevant to this action

(including on and after June 15, 1999) a director of Sagam Corp.  He was also at all times

relevant to this action (including on and after June 15, 1999) a shareholder of corporate entities

which were shareholders of Sagam Corp. and Sagam Management.  Menachem Ivcher is a

citizen of Israel and a resident of Florida.  He maintains a residence at 19667 Turnberry Way,

Unit 25, North Miami Beach, Florida.

5.     Defendant Jennifer Ivcher was at all times relevant to this action

(including on and after June 15, 1999) a director and officer of Sagam Management.  She was

also at all times relevant to this action (including on and after June 15, 1999) a shareholder of AL

Management which was a shareholder of Sagam Management. Jennifer Ivcher is Menachem's

daughter. Jennifer Ivcher is a citizen of the United States and a resident of Florida.

6.      Defendant Sagiv Shiv was at all times relevant to this action (including on

and after June 15, 1999) a shareholder of Sagam Management. He also served as a director and

an officer of Sagam Management until around September 1997. Sagiv was also a director and

officer of Sydney Plastics until at least 1997. Sagiv Shiv is Yehuda Shiv's son. Sagiv is a citizen

of Israel and maintains a residence at 150 Columbus Avenue, Apt. 22C, New York, New York.

7.      Defendant AL Management is a corporation formed under the laws of a

State in the United States (and likely either in New York, Florida or Nevada). It is a shareholder

of Sagam Management and is itself owned by Menachem Ivcher and/or Jennifer Ivcher.

8.      Defendant Eclectic is a corporation formed under the laws of the British

Virgin Islands. Eclectic was formed for the purpose of holding financial assets of Menachem

Ivcher. Menachem Ivcher was at all times relevant to this action (including on and after June 15,

1999) and remains the sole shareholder of Eclectic. Menachem Ivcher was at all time relevant to

this action (including on and after June 15, 1999) and remains a director and/or officer of

Eclectic.

9.      Defendant Sydney Plastics was at all times relevant to this action a Florida

corporation. According to the records of the Florida Department of State, Sydney is currently

inactive. Its principal place of business and mailing address are listed as 300 N.E. 187th Street,

North Miami Beach, Florida, and its registered agent is Leslie A. Rosencwaig, 1 S.E. Third

Avenue, Suite 960, Miami, Florida 33131. Menachem Ivcher was at all times relevant to this

action (including on and after June 15, 1999) and remains the sole shareholder of Sydney

Plastics.  Menachem Ivcher was at all times relevant to this action (including on and after June 15, 1999) a director and/or officer of Sydney Plastics.

       10.    Defendant Ameripackaging was at all times relevant to this action (including on and after June 15, 1999) and remains a Florida corporation.  Its principal place of business is 3751 N.E. 214th Street, Miami, Florida, and its mailing address (according to the records of the Florida Department of State) is P.O. Box 800851, Aventura, Florida 33280.  Its registered agent is Leslie A. Rosencwaig, 1 S.E. Third Avenue, Suite 960, Miami, Florida 33131.

       11.    Ameripackaging is the successor to, and a mere continuation of, Sydney.  Menachem Ivcher was at all time relevant to this action (including on and after June 15, 1999) and remains the sole shareholder of Ameripackaging.  Menachem Ivcher was at all time relevant to this action (including on and after June 15, 1999) and remains a director and/or officer of Ameripackaging.

## INTRODUCTION

       12.    From at least 1994 through 2001, Shiv, through the Sagam Entities, provided investment advisory services to clients, including, without limitation, the management of securities and other investments held in accounts ("Client Accounts") at Bank Julius Baer & Co., Ltd. ("BJB").  The SEC Action alleges, *inter alia*, that Shiv, Sagam Management and Sagam Capital committed violations of the Securities Act of 1933, the Securities Exchange Act of 1934 and the Investment Advisors Act of 1940 by, among other things, distributing false account statements to the beneficial owners ("Account Holders") of the Client Accounts purporting to show investment gains (when, in fact, there were steep losses), and collecting performance fees on the inflated account values reported in the false statements.

13.    Shiv also misused purported powers of attorney given to him by Account Holders and improperly (a) transferred money out of certain Client Accounts to certain other Client Accounts, (b) transferred money out of certain Client Accounts to third parties unrelated to the applicable Account Holder (but in many cases affiliated or related to, among others, Menachem Ivcher, Eclectic, or Sydney Plastics), and (c) pledged certain Client Accounts and other accounts to BJB for the benefit of Menachem Ivcher, Eclectic, Sydney Plastics and Ameripackaging (as successor to Sydney Plastics).

14.    As a consequence of these improper actions, Account Holders have asserted claims against the Sagam Entities and the Receivership Estate in excess of $100 million, which amount includes improper transfers from their Client Accounts to or for the benefit of other Account Holders,  improper transfers from their Client Accounts to or for the benefit of Menachem Ivcher, Eclectic, Sydney Plastics or Ameripackaging, improper transfers from their Client Accounts to or for the benefit of third parties, improper pledges of their Client Accounts, and management fees improperly charged to their Client Accounts.

15.    Shiv was a director and officer of one or more of the Sagam Entities and, by pursuing his fraudulent scheme, breached his fiduciary duties to the Sagam Entities.

16.    Menachem Ivcher conspired with, encouraged, and provided substantial assistance to Shiv in a scheme in which Shiv breached his fiduciary duties to the Sagam Entities by, among other things, defrauding the Account Holders.

17.    Menachem Ivcher knew or should have known about Shiv's fraudulent activities and scheme.

18.    Menachem Ivcher, Jennifer Ivcher, Sagiv Shiv, AL Management, Eclectic, Sydney Plastics and Ameripackaging each benefitted from Shiv's fraudulent scheme.

19.    Jennifer Ivcher knew or should have known about Shiv's fraudulent activities and scheme.  Jennifer also knew or should have known about Menachem's participation with, and having provided substantial assistance to, Shiv in pursuing that fraudulent scheme.

20.    As a director and/or officer of one of more of the Sagam Entities, Menachem Ivcher owed fiduciary duties to, among others, the Sagam Entities.  By permitting and/or encouraging Shiv's fraudulent activities, Menachem breached his fiduciary duties to the Sagam Entities.

21.    As a director and/or officer of one of more of the Sagam Entities, Jennifer Ivcher owed fiduciary duties to, among others, the Sagam Entities.  By permitting Shiv's fraudulent activities, Jennifer breached her fiduciary duties to the Sagam Entities.

22.    Based on their conduct, Menachem Ivcher and Jennifer Ivcher are each liable to the Receivership Estate for damages sustained as a result of Shiv's fraudulent activities and scheme.

23.    Shiv also improperly and fraudulently pledged the bank accounts of the Sagam Entities and Flame ("Sagam/Flame Accounts") as collateral to BJB to secure the obligations of Waxfield Ltd. ("Waxfield") to BJB; Shiv had previously improperly and fraudulently pledged the bank account of Waxfield as collateral to BJB to secure the obligations of Eclectic and/or Sydney Plastics to BJB.  The Sagam/Flame Accounts include the improper management fees paid to the Sagam Entities by the Account Holders resulting from Shiv's fraudulent activities and scheme.  As a consequence thereof, Eclectic, Sydney Plastics, Ameripackaging (as successor to Sydney Plastics) and/or Menachem Ivcher were unjustly enriched and are liable to the Receivership Estate for their unjust enrichment.

24.    Sagiv Shiv and AL Management, as shareholders of the Sagam Entities and who controlled the Sagam Entities in a manner that facilitated Shiv's fraudulent scheme and for their personal benefit, are responsible for the Sagam Entities' liabilities.

25.    Menachem Ivcher and Jennifer Ivcher, the shareholders of AL Management and who controlled AL Management and indirectly the Sagam Entities in a manner that facilitated Shiv's fraudulent scheme, is responsible for the Sagam Entities' liablities.

## JURISDICTION AND VENUE

26.    The Receivership Estate includes the claims of the Sagam Entities against third parties and the Receiver has been authorized by this Court to commence action to recover such claims. *See* Injunction Order ¶ IX.D (empowering the Receiver to "acquire and retain all rights and powers which the [Sagam Entities] have to manage, control, operate and maintain their businesses . . . , and to possess, receive, or use income, earnings, rents, and profits with full power to commence, maintain, defend or participate in legal proceedings, to sue for, collect, receive and take into possession all goods, chattels, rights, general intangibles, choses in action, credits, monies, effects, lands, books and records of account, and other papers . . ."). The Receivership Estate also includes the Sagam/Flame Accounts.

27.    Paragraph XIII.B of the Preliminary Injunction Order provides that "no creditor . . . of the [the Sagam Entities], or any person acting on behalf of such creditor . . . shall take any action to interfere with the taking control, possession, or management of the assets transferred to the temporary receiver under this Order, nor interfere in any way with the exclusive jurisdiction of this Court over the receivership estate." Since this action involves claims of the Receivership Estate against third parties, it is ancillary to the main SEC Action and this Court has subject matter jurisdiction.

28.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and (2) in that the Receiver is a citizen of a State (*i.e.*., New Jersey) and the defendants are each citizens of a different State (*i.e.*, Florida) or a foreign State (*i.e.*, Israel), and the amount in controversy exceeds $75,000. Each of the Defendants committed tortious conduct within the State of New York.

29.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the claims herein occurred in this district.

## FORMATION OF THE SAGAM ENTITIES

### Background

30.    Shiv and Menachem Ivcher grew up in the same Israeli town and knew each other since childhood.

31.    Shiv worked for Bank Leumi in Israel and in New York from 1950 to 1983; some point during this period, Menachem was a large investor in Bank Leumi stock.

32.    In or around 1983, Menachem approached Shiv and solicited advice as to the best means to handle the existing Israeli bank crisis. Shiv provided assistance to Menachem with regard thereto.

33.    Menachem was grateful to Shiv, and invited Shiv to work for him. Accordingly, in 1984, Menachem paid Shiv $150,000 to leave Bank Leumi and gave Shiv capital to start an investment company in partnership with Menachem.

34.    Shiv moved to New York, and using Menachem's capital, set up Sagam Corp. in partnership with Menachem.

**Sagam Corp.**

35.     Sagam Corp. was incorporated in New York on January 13, 1984.  At the time of its formation, Shiv (through an entity named Spectra) owned 292 shares of Sagam Corp., Menachem Ivcher owned 228 shares and Dov Levi owned 60 shares.

36.     In 1987, all outstanding shares of Sagam Corp. stock were cancelled and new shares were issued as follows:  Jeda Corp. (50 shares) and Spectra (50 shares).  At the time, Jeda Corp. was owned by Menachem, and Spectra remained owned by Shiv.

37.     Jeda was dissolved on June 12, 1997 and, at such time, Jeda's ownership interest in Sagam Corp. was transferred to either Eclectic (which Menachem Ivcher wholly owned and continues to wholly own) or Menachem Ivcher directly.

38.     On September 3, 1987, Shiv and Menachem Ivcher were appointed directors of Sagam Corp.

39.     Sagam's corporate records do not reflect any change in the directors after September 3, 1987.

**Sagam Management**

40.     Sagam Management was incorporated in Delaware on June 14, 1989.

41.     The shareholders of Sagam Management are, and have been since its incorporation: Shiv (100 shares), Sagiv Shiv (100 shares), and AL Management (200 shares).

42.     Menachem Ivcher and Jennifer Ivcher were at all times relevant to this action (including on and after June 15, 1999) and remain shareholders of AL Management.

43.     Sagiv Shiv served as a director and an officer of Sagam Management until around September 1997.  Sagiv Shiv was at all relevant times to this action (including on and after June 15, 1999) and remains a shareholder of Sagam Management.

9

44.    Jennifer Ivcher was appointed as an officer of Sagam Management in September 1997. She was elected as a director of Sagam Management in January 1998. She was never removed and never removed herself from any of those positions.

**Sagam Capital**

45.    Sagam Capital was incorporated in Delaware on March 30, 1998.

46.    Shiv was the sole member of Sagam Capital.

## OPERATION OF THE SAGAM ENTITIES

**Overview**

47.    Shiv and Menachem Ivcher conspired against, and convinced several investors and their families, many of whom were their personal friends or relatives, to open accounts with BJB, and to grant Shiv powers of attorney to carry out investments through the Sagam Entities with funds of the Account Holders.

48.    Shiv, on behalf of the Sagam Entities, then proceeded to invest these clients' funds utilizing highly leveraged trading strategies (some involving foreign currency) and private equity ventures which resulted in massive losses. Rather than report such losses to the Account Holders, Shiv embarked upon a scheme to issue false account statements concealing the Account Holders' losses and reporting regular gains in the accounts.

49.    Menachem Ivcher conspired with, encouraged and/or assisted Shiv in connection with Shiv's risky investment strategy and issuance of false account statements.

50.    Menachem Ivcher and Jennifer Ivcher each were also aware of or should have been aware of Shiv's risky investment trading strategy, the Account Holders' losses and Shiv's issuance of false account statements.

51.    In order to support Menachem Ivcher's failing Eclectic, Sydney Plastics and other businesses and/or enable Menachem Ivcher to pay fines levied against him and his businesses, Shiv began transferring money from one or more Account Holder's Client Account without such Account Holder's knowledge or approval to or for the benefit of Menachem Ivcher, Eclectic, Sydney Plastics, and/or other Menachem Ivcher-controlled businesses (including, without limitation, to pay off loan obligations of Eclectic and Sydney Plastics to BJB).

52.    Menachem Ivcher conspired with, encouraged and/or assisted Shiv in connection with Shiv's improper transferring of money from one or more Account Holder's Client Account to or for the benefit of Menachem Ivcher, Eclectic, Sydney Plastics, and/or other Menachem Ivcher-controlled businesses.  Menachem Ivcher and Jennifer Ivcher each knew or should have known about such transfers.

53.    In a further effort to support Menachem Ivcher's failing Eclectic, Sydney Plastics and other businesses and/or enable Menachem Ivcher to pay fines levied against him and Eclectic, Sydney Plastics and other businesses, Shiv used powers of attorney to improperly pledge Client Accounts of certain Account Holders and the Sagam/Flame Accounts to directly or indirectly collateralize loans issued by BJB to Eclectic and Sydney Plastics.

54.    Specifically, Account 100847-1 (the account of Waxfield) and Account No. 101018 (the account of Crandon Park S.A.) were pledged as collateral for Eclectic's and/or Sydney Plastic's obligations to BJB.  In addition, Sagam Capital (Account 100906), Sagam Management (Account 100710), Sagam Corp. (Account 100642) and Sagam Capital Management Investment (Account 100722) were pledged as collateral to secure Waxfield's obligations to BJB, which, by virtue of the aforementioned pledge of the Waxfield account, could mean, as BJB has argued and the Receiver has challenged, that the Sagam Entities' bank

accounts were indirectly collateralizing Eclectic's and/or Sydney Plastic's obligations to BJB. Further, Flame (Account 100659-1) was pledged as collateral to secure Sagam Capital's obligations to BJB, which, by virtue of the aforementioned pledges of the Sagam Capital account and the Waxfield account, could mean, as BJB has argued and the Receiver has challenged, that Flame's bank account was indirectly collateralizing Eclectic's and/or Sydney Plastic's obligations to BJB. The pledges of the accounts of Waxfield, Crandon, Sagam Entities and Flame are collectively referred to hereinafter as the "Pledges".

55.     The Pledges allowed Menachem Ivcher to withdraw funds at BJB which previously served as collateral for loans made by BJB to or for the benefit of Menachem Ivcher or his companies (including Eclectic and Sydney Plastics).

56.     Menachem Ivcher conspired with, encouraged and/or assisted Shiv in connection with the Pledges. Menachem Ivcher and Jennifer Ivcher each knew or should have known about the Pledges.

**The Failure of Shiv's Investment Strategy**

57.     The Sagam Entities and Shiv essentially acted as money manager of at least 35 Client Accounts, primarily investing client funds in foreign currencies and mortgage-backed securities. All of the Client Accounts were securities accounts with BJB.

58.     After various Client Accounts were opened with BJB, Shiv's investment of client funds was not conservative. In addition to at least one failed private equity venture investment, Shiv pursued a highly-leveraged trading strategy through BJB through which he would borrow Japanese yen at low interest rates, convert the yen to United States dollars, and then use those dollars to purchase high-interest securities in the Federal Home Loan Mortgage Corporation known as "Freddie Macs".

Doc #31074939_V16.WPD

59.    Pursuant to this speculative investment strategy, through which Shiv attempted to take advantage of any "spread" between the low-interest yen loans and the high-interest Freddie Macs, Shiv's clients would benefit if and only if the Freddie Macs maintained their value. Shiv's strategy was particularly vulnerable to sudden market volatility. Shiv borrowed heavily from BJB on behalf of the Account Holders to effectuate his trading strategy.

60.    In and around 1994, the bond market collapsed and Shiv was unable to find buyers for the Freddie Macs he had accumulated as part of his trading strategy. Because of the high degree of borrowing inherent in and integral to Shiv's investment strategy, this lack of demand for Freddie Macs resulted in massive losses in all of the Client Accounts.

61.    Rather than admit these mounting losses to the Account Holders, Shiv continued to send the Account Holders false statements indicating consistently positive returns. From 1994 until 2001, the gap between the Account Holders' actual account values and the values Shiv reported grew larger each year. Shiv issued account statements to Account Holders showing approximately a 10% gain in net asset value per year, when in fact the net asset value of the Client Accounts was decreasing due to investment losses. From approximately 1994 to 2001, the management fees which the Account Holders were unwittingly required to pay to the Sagam Entities increased each year, while the Account Holders' net asset value decreased each year.

62.    By October 31, 2001, Shiv had overstated the net value of assets in ten Client Accounts by at least $183 million. The Sagam Entities continued to profit during the course of the deception by, among other things, receiving millions of dollars in management and performance fees based on the inflated asset values.

63.    Sagiv Shiv received compensation from the Sagam Entities during the course of Shiv's fraudulent scheme and thus benefitted as a consequence thereof. Sagiv Shiv also received compensation from Sydney Plastics in his capacity as officer and director thereof and thus benefitted as a consequence of Shiv's fraudulent scheme which preserved the continued viability of Sydney Plastics.

64.    Menachem Ivcher conspired with Shiv regarding, encouraged, and/or assisted Shiv's sending of false statement, overstating of Client Account asset value, and charging of excessive management fees.

65.    Through the improper transfers and the Pledges effected by Shiv, Menachem Ivcher received or was intended to receive certain of the improper benefits derived from Shiv's fraudulent scheme.

66.    Through the improper transfers and the Pledges effected by Shiv, Sagiv Shiv received or was intended to receive certain of the improper benefits derived from Shiv's fraudulent scheme.

67.    Menachem Ivcher and Jennifer Ivcher were each aware or should have been aware that Shiv was sending false statement to the Account Holders, was overstating the value of assets in the Client Accounts, and was charging excessive management fees.

**Menachem Ivcher's Related Business Dealings**

68.    Menachem Ivcher was indicted for using a Florida plastics manufacturing company which he owned to purchase heavy machinery with government subsidies and then reselling the machines abroad at a profit. In or about 1992, as a penalty for misusing these subsidies, Menachem was ordered to pay a $9 million fine. As a result, Menachem's account with the Sagam Entities shrunk to almost nothing.

69.     Menachem paid his $9 million fine with a loan from BJB.  His and his businesses' losses subsequently continued to mount.

70.     Furthermore, in or about late 1997, Menachem Ivcher and his brother, Baruch Ivcher ("Baruch" or "Baruch Ivcher"), were charged by Peruvian officials with criminal tax evasion.  Thereafter, Baruch fled Peru and feared that his assets at Bank Leumi in Miami, worth approximately $50,000,000, would be subject to seizure or attachment by the Peruvian government.

71.     Baruch thereafter moved his money from Bank Leumi to BJB where it was managed by the Sagam Entities, with a power of attorney vested in Shiv.

**Transactions Involving Waxfield**

72.     As part of his fraudulent scheme, Shiv obtained a list of available shell companies located in Panama and the British Virgin Islands, where companies may issue general powers of attorney without the supervision of or authentication by a notary public.  He selected Waxfield from the list.

73.     On or about May 16, 1997, Waxfield was incorporated in the British Virgin Islands as an International Business Company.

74.     On or about May 22, 1997, general powers of attorney conferring broad discretion to act on behalf of Waxfield were issued to Baruch Ivcher, his wife Neomy Ivcher, and Shiv.  Baruch Ivcher and Neomy Ivcher are the beneficial owners of Waxfield.

75.     On or about September 10, 1997, an application was completed by Baruch and Neomy Ivcher on behalf of Waxfield to open an account in Waxfield's name at BJB.

76.     On or about October 20, 1997, Shiv, using the general power of attorney with respect to Waxfield, pledged to BJB all of Waxfield's funds and other assets in accounts at

BJB to secure "any and all present or future obligations due to [BJB]" from Eclectic and/or Sydney Plastics.

     77.    Thereafter, Baruch Ivcher made or caused to be made an initial deposit into the Waxfield account.

     78.    Following the Pledges of the Waxfield account, BJB made additional loans to Eclectic, Sydney Plastics and/or Menachem Ivcher.

     79.    Baruch Ivcher and Neomy Ivcher, the beneficial owners of the Waxfield account, have no equity interest in either Eclectic or Sydney Plastics. Baruch Ivcher did not authorize the Pledges of the Waxfield Account.

     80.    At the time that the Waxfield Group was created and the pledge of its assets to BJB made, Sydney and/or Eclectic owed or were alleged to owe approximately $25 million to BJB. Those entities lacked and continue to lack sufficient income or assets to repay their loans to BJB.

     81.    On or about January 12, 1998, pursuant to the general power of attorney granted to him with respect to Waxfield, Shiv executed an agreement pledging all of Waxfield's assets in accounts at BJB to secure "any and all present or future obligations due to [BJB]" from Productos Paraiso Del Peru, S.A. ("Productos"). Baruch Ivcher is the beneficial owner of Productos.

     82.    After the various pledges of the Waxfield account to BJB, Menachem directed Shiv to transfer, and Shiv transferred, monies from the Waxfield account to pay down Eclectic's and/or Sydney Plastic's loan obligations and/or to permit Menachem to withdraw his funds from BJB.

83.     Neither Shiv, the Sagam Entities nor Menachem ever advised Waxfield, Baruch Ivcher or Neomy Ivcher that the Waxfield account had been pledged to secure third-party obligations owed to BJB.

84.     By 2001, Eclectic was obligated to BJB in respect of more than $16 million dollars of loans and Sydney Plastics was obligated to BJB in respect of more than $10 million dollars of loans.  BJB has contended that the Waxfield account, by virtue of the Pledges thereof, secures the more than $26 million in obligations to BJB from Eclectic and Sydney Plastics.

85.     Waxfield has asserted substantial claims against the Receivership Estate based on the above-described scheme and the conduct of Shiv, Menachem Ivcher and other fiduciaries of the Sagam Entities.

86.     Menachem Ivcher conspired with, encouraged and/or assisted Shiv in connection with Shiv's defrauding of Waxfield, Baruch Ivcher and Neomy Ivcher, as described above.

87.     Menachem Ivcher and Jennifer Ivcher each knew or should have known about Shiv's defrauding of Waxfield, Baruch Ivcher and Neomy Ivcher, as described above.

**Other Unauthorized Transfers and Pledges**

88.     The maintenance of BJB's loans to Menachem Ivcher's companies became a driving force behind Menachem's and Shiv's fraudulent scheme.

89.     In that regard, Shiv used powers of attorney to transfer funds from a number of the Client Accounts to or for the benefit of Menachem Ivcher, Eclectic, Sydney Plastics and other Menachem Ivcher controlled entities (including transfers that were made first

to a Sagam Entity and then immediately to Menachem Ivcher, Eclectic, Sydney Plastics or another Menachem Ivcher controlled entity).

90.     During the course of Shiv's scheme, approximately $15 million was improperly transferred from Client Accounts to or for the benefit of Menachem Ivcher, Eclectic, Sydney Plastics and/or other Menachem Ivcher controlled entities. For example, on or about March 9, 2001, Shiv improperly transferred $5,700,000 from the Waxfield account to Eclectic's account and $800,000 from the Crandon Park account to Eclectic's account; on or about September 14, 2000, Shiv improperly transferred $320,000 from the Skilled Investors Inc. account to Angora Overseas SA, an entity owned by Menachem Ivcher.

91.     In addition, during the course of Shiv's scheme, approximately $5 million was improperly transferred from Client Accounts to other third party entities who may or may not be affiliated with Menachem Ivcher. For example, on or about January 9, 2001, Shiv improperly transferred $1,000,000 from B.B.C.F.D. S.A. (through one of the Sagam Entities) to "LGHI", and on or about February 2, 2001, Shiv improperly transferred $650,000 from B.B.C.F.D. S.A. (through one of the Sagam Entities) to "Sun Trust Bank-Bay".

92.     Further, during the course of Shiv's scheme, in order to avoid an Account Holder's discovery of their fraudulent activities, approximately $15 million was improperly transferred from one Account Holder's Client Account to another unaffiliated Account Holder's Client Account. For example, on or about November 2, 2000, January 30, 2001 and August 20, 2001, Shiv improperly transferred $1,000,000, $1,000,000, and $1,475,000, respectively, from the B.B.C.F.D. S.A. account to the Waxfield account; on or about March 1, 2000, Shiv improperly transferred $1,000,000 from the Skilled Investors Inc. account to the Waxfield account.

93.     Menachem Ivcher conspired with, encouraged and/or assisted Shiv in connection with Shiv's improper use of powers of attorney and improper transfers from Client Accounts to or for the benefit of Menachem Ivcher, Eclectic, Sydney Plastics and/or other Menachem Ivcher controlled entities, to or for the benefit of other third party entities, and/or to or for the benefit of other Account Holders' Client Accounts.

94.     Menachem Ivcher and Jennifer Ivcher each knew or should have known about Shiv's improper use of powers of attorney and improper transfers from Client Accounts to or for the benefit of Menachem Ivcher, Eclectic, Sydney Plastics and/or other Menachem Ivcher controlled entities, to or for the benefit of other third party entities, and/or to or for the benefit of other Account Holders' Client Accounts.

## THE RECEIVER'S INVESTIGATION

95.     Pursuant to the Injunction Order, the Receiver, among other things, was empowered to take and retain immediate possession, custody and control of all assets and property and the books and records of the Sagam Entities, and conduct an investigation of the past and present operations, activities and condition of the Sagam Entities.

96.     On February 28, 2002, the Receiver filed a report in the SEC Action summarizing the result of his investigation as of that date.

## THE RECEIVER'S AVOIDANCE ACTION

97.     On March 24, 2004, the Receiver commenced the action styled *Arthur Steinberg, as Temporary Receiver of Sagam Capital Management Corp. and Sagam Capital LLC, B.B.C.F.D. S.A. and Skilled Investors Inc. v. Bank Julius Baer & Co., Ltd. and Waxfield Ltd.*, Civil Action 04-CV-2339 (S.D.N.Y.) ("Avoidance Action") seeking, *inter alia*, avoidance

of the Pledges of the Sagam/Flame Accounts and the return to the Receiver of the balance of funds in such accounts.

98.     The Sagam/Flame Accounts contain approximately $5.053 million.

99.     The Receiver has agreed to settle the Avoidance Action as against BJB for a payment of $3.375 million by BJB to the Receiver, as well as other non-monetary consideration, and BJB will be entitled to retain the balance of funds in the Sagam/Flame Accounts (the "Avoidance Action Settlement").

100.     As a consequence, pursuant to the Avoidance Action Settlement, the Receivership Estate will receive approximately $1.678 million less than the aggregate balances in the Sagam/Flame Accounts.

101.     The Avoidance Action Settlement remains subject to Court approval.

102.     Eclectic, Sydney Plastics and Ameripackaging (as successor to Sydney Plastics) were potentially the beneficiaries of the Pledges of the Sagam/Flame Accounts.

103.     As owner of Eclectic, Sydney Plastics and Ameripackaging, Menachem Ivcher was an indirect beneficiary of the Pledges of the Sagam/Flame Accounts.

104.     As an officer of Sydney Plastics, Sagiv Shiv was an indirect beneficiary of the Pledges of the Sagam/Flame Accounts.

105.     Neither Eclectic, Sydney Plastics, Ameripackaging, nor Menachem Ivcher provided any consideration to the Sagam Entities or Flame in exchange for the Pledges of the Sagam/Flame Accounts.

106.     Menachem Ivcher conspired with, encouraged and/or assisted Shiv in connection with Shiv's granting of the Pledges of the Sagam/Flame Accounts.

107. Menachem Ivcher and Jennifer Ivcher each knew or should have known about Shiv's granting of the Pledges of the Sagam/Flame Accounts.

108. As a result of the improper Pledges of the Sagam/Flame Accounts, Eclectic, Sydney Plastics and Ameripackaging and Menachem Ivcher as the owner of such entities were unjustly enriched at the expense of the Receivership Estate in an amount equal to the amounts held in the Sagam/Flame Accounts.

## LIABILITIES OF THE RECEIVERSHIP ESTATE

109. As a result of Shiv's and the Defendants' action, the Sagam Entities face substantial liabilities to the Account Holders including, without limitation, on account of improperly charged management fees, improper transfers from the Client Accounts, and improper pledging of the Client Accounts.

110. A number of Account Holders have filed Proofs of Claims in this Court to claim a share of the distributions from the Receivership Estate, including the following as specified in paragraphs 111 through 117.

111. Waxfield (on behalf of itself and its predecessor Rutland Enterprises, Inc. A.V.V.) has claimed damages of $65,952,713.00 on account of unauthorized transfers of funds and unauthorized pledges.

112. Crandon Park S.A. has claimed damages of $1,304,569.00 on account of unauthorized transfers of funds and unauthorized pledges.

113. Orinoco International Corp. has claimed damages of $1,828,532.00 on account of unauthorized transfers of funds and improper management fees paid to the Sagam Entities.

114.    Exeed Corp. has claimed damages of $2,804,890.77 on account of trading losses, unauthorized transfers of funds and improper management fees paid to the Sagam Entities.

115.    Skilled Investors Inc. has claimed damages of $31,565,203.38 on account of unauthorized transfers of funds and improper management fees paid to the Sagam Entities.

116.    B.B.C.F.D. S.A. has claimed damages of $50,000,000.00 on account of trading losses, unauthorized transfers of funds, improper management fees paid to the Sagam Entities and other losses.  Mr. Nassi, the President of BBCFD, and Bijan Royal, Inc. have each also asserted damages of $50,000,000.00.

117.    Westland has claimed damages of $17,000,000.00 on account of trading losses, unauthorized transfers of funds and improper management fees paid to the Sagam Entities.

118.    The Receivership Estate has also incurred damages resulting from the improper Pledges of the Sagam/Flame Accounts in an amount up to the balance of funds in such accounts.

119.    The Receivership Estate has also incurred damages resulting from the costs associated with the administration of the Receivership Estate including the costs and fees of the Receiver and his agents and professionals (the "Receivership Administration Costs").

120.    Accordingly, as a consequence of (i) the conspiracy to commit fraud between Shiv and Menachem Ivcher, (ii) Menachem Ivcher's substantial assistance to Shiv in committing fraudulent actions, (iii) Menachem Ivcher's breach of his fiduciary duties to the Sagam Entities and/or (iv) Jennifer Ivcher's breach of her fiduciary duties to the Sagam Entities, the Sagam Entities have sustained substantial damages.

## COUNT I

### (Aiding and Abetting Fraud – Menachem Ivcher)

121.    The Receiver repeats and realleges each and every allegation contained in paragraphs 1 through 120 of this Complaint as if fully set forth herein.

122.    Menachem Ivcher was aware of the fraudulent actions and scheme undertaken by Shiv as detailed herein.

123.    Menachem Ivcher substantially assisted and encouraged Shiv in pursuing the fraudulent actions and scheme detailed herein.

124.    As a result of Shiv's scheme, the Sagam Entities have incurred substantial liability to the Account Holders and have otherwise been damaged.

125.    The Receivership Estate has succeeded to the liabilities of the Sagam Entities.

126.    Menachem Ivcher is liable to the Receivership Estate for all liabilities and damages sustained by the Receivership Estate as a result of his aiding and abetting the fraud committed by Shiv, including on account of (a) the Receivership Estate's liability to the Account Holders, (b) the Receivership Estate's damages resulting from the Pledges of the Sagam/Flame Accounts (which damages total $1.678 million in the event that the Avoidance Action Settlement is approved (and may be higher in the event the Avoidance Action Settlement is not approved and the Avoidance Action is ultimately not successful)), and (c) the Receivership Administration Costs.

## COUNT II

### (Aiding and Abetting Breach of Fiduciary Duty – Menachem Ivcher)

127.    The Receiver repeats and realleges each and every allegation contained in paragraphs 1 through 126 of this Complaint as if fully set forth herein.

128.    Shiv, as a director, officer, and/or shareholder of one or more of the Sagam Entities, owed a fiduciary duty to, among others, the Sagam Entities.

129.    These fiduciary duties include both a duty of care and a duty of loyalty, prohibiting both wasting of corporate assets and self-dealing.

130.    Shiv breached his fiduciary duty to, among others, the Sagam Entities by means of the fraudulent conduct and scheme detailed herein.

131.    Shiv breached his duty of care to the Sagam Entities by undertaking the fraudulent conduct and scheme detailed herein including abusing the powers of attorney granted to him, making unauthorized transfers from the Client Accounts, granting unauthorized Pledges, issuing false bank statements to the Account Holders, charging and receiving improper management fees, and taking other actions to conceal and cover up the fraud, all of which actions subjected the Sagam Entities to substantial liabilities.

132.    Shiv breached his duty of loyalty to the Sagam Entities by receiving compensation from the Sagam Entities during the pendency of his fraudulent scheme and his efforts to conceal that scheme.

133.    Menachem Ivcher was aware of the fraudulent actions and scheme undertaken by Shiv and of Shiv's breaches of his duties of loyalty and care as detailed herein.

134.    Menachem Ivcher substantially assisted and encouraged Shiv in pursuing the fraudulent actions and scheme detailed herein.

135.    Menachem Ivcher knowingly induced or participated with Shiv in pursuing the fraudulent actions and scheme detailed herein.

136.    Menachem Ivcher is liable to the Receivership Estate for all liabilities and damages sustained by the Receivership Estate as a result of his aiding and abetting Shiv's breach of fiduciary duties to the Sagam Entities, including on account of the Receivership Estate's liability to the Account Holders, the Receivership Estate's damages resulting from the Pledges of the Sagam/Flame Accounts, and the Receivership Administration Costs.

## COUNT III

### (Breach of Fiduciary Duty – Menachem Ivcher and Jennifer Ivcher)

137.    The Receiver repeats and realleges each and every allegation contained in paragraphs 1 through 136 of this Complaint as if fully set forth herein.

138.    Menachem Ivcher and Jennifer Ivcher, as a director and/or officer of one or more of the Sagam Entities, each owed a fiduciary duty to, among others, the Sagam Entities.

139.    This fiduciary duty includes both a duty of care and a duty of loyalty, prohibiting both wasting of corporate assets and self-dealing.

140.    Menachem Ivcher and Jennifer Ivcher each breached his or her respective fiduciary duties to the Sagam Entities by means of the conduct described above.

141.    In particular, Menachem Ivcher breached his duty of care to the Sagam Entities by recklessly permitting Shiv to undertake the fraudulent scheme detailed herein and thereby causing substantial damage to the Sagam Entities.

142.    Jennifer Ivcher breached her duty of care to the Sagam Entities by recklessly permitting Shiv to undertake the fraudulent scheme detailed herein and thereby causing substantial damage to the Sagam Entities.

143.    Menachem Ivcher engaged in self-dealing and breached his duty of loyalty to the Sagam Entities by encouraging and/or substantially assisting Shiv in transferring funds from the Client Accounts to or for the benefit of Menachem Ivcher, Eclectic, Sydney Plastics and/or other Menachem Ivcher controlled businesses.

144.    Menachem Ivcher engaged in self-dealing and breached his duty of loyalty to the Sagam Entities by encouraging and/or substantially assisting Shiv in granting the Pledges for the ultimate benefit of Eclectic and Sydney Plastics, both of which entities Menachem Ivcher owned and controlled.

145.    Menachem Ivcher and Jennifer Ivcher are each liable to the Receivership Estate for all liabilities and damages sustained by the Receivership Estate as a result of his or her breach of fiduciary duties to the Sagam Entities, including on account of the Receivership Estate's liability to the Account Holders, the Receivership Estate's damages resulting from the Pledges of the Sagam/Flame Accounts, and the Receivership Administration Costs.

## COUNT IV

### (Unjust Enrichment – Menachem Ivcher, Eclectic, Sydney Plastics, and Ameripackaging)

146.    The Receiver repeats and realleges each and every allegation contained in paragraphs 1 through 145 of this Complaint as if fully set forth herein.

147.    Eclectic, Sydney Plastics and Ameripackaging (as successor to Sydney Plastics) were potentially the beneficiaries of the Pledges of the Sagam/Flame Accounts.

148.    Menachem Ivcher, as owner of Eclectic, Sydney Plastics and Ameripackaging, was a beneficiary of the improper transfers and an indirect beneficiary of the Pledges of the Sagam/Flame Accounts.

149.    Eclectic, Sydney Plastics and Ameripackaging (as successor to Sydney Plastics) were able to, and did, borrow additional monies from BJB as a result of the improper transfers and the Pledges of the Sagam/Flame Accounts.

150.    The transfers from the Client Accounts for the benefit of Menachem Ivcher and his companies were improper and a breach of Shiv's fiduciary duties to the Sagam Entities.

151.    The Pledges of the Sagam/Flame Accounts were improper and a breach of Shiv's fiduciary duties.

152.    The Sagam Entities and Flame did not receive any consideration from Menachem Ivcher, Eclectic, Sydney Plastics and Ameripackaging or otherwise in exchange for the Pledges of the Sagam/Flame Accounts.

153.    As a result, Eclectic, Sydney Plastics and Ameripackaging and Menachem Ivcher as the owner of such entities were unjustly enriched at the expense of the Receivership Estate in an amount equal to the amounts held in the Sagam/Flame Accounts.

## COUNT V

**(Piercing the Veil – Sagiv Shiv, AL Management, Menachem Ivcher and Jennifer Ivcher)**

154.    The Receiver repeats and realleges each and every allegation contained in paragraphs 1 through 153 of this Complaint as if fully set forth herein.

155.    The Sagam Entities are liable or potentially liable to the Account Holders for damages sustained as a consequence of Shiv's fraudulent scheme, to BJB on account of the Pledges of the Sagam/Flame Accounts, and to the Receiver and others on account of the Receivership Administration Costs.

156.    The shareholders of the Sagam Entities – Shiv, Sagiv Shiv, and AL Management (through the conduct of its shareholders Menachem Ivcher and Jennifer Ivcher) – exercised complete control of the Sagam Entities, used the Sagam Entities (or permitted the Sagam Entities to be used) to perpetrate fraud, and operated the Sagam Entities for their personal benefit and as their "alter ego".

157.    Menachem Ivcher and Jennifer Ivcher, the shareholders of AL Management, exercised complete control of AL Management and operated AL Management for their personal benefit and as their "alter ego".

158.    The Sagam Entities' shareholders, by operating the Sagam Entities for their personal benefit, facilitated the fraudulent scheme undertaken by Shiv.

159.    Menachem Ivcher's and Jennifer Ivcher's, by operating AL Management for their personal benefit, facilitated the fraudulent scheme undertaken by Shiv.

160.    The fraudulent scheme directed by Shiv, with the assistance, encouragement and/or awareness of Sagiv Shiv, AL Management, Menachem Ivcher, and Jennifer Ivcher directly or indirectly benefitted Shiv, Sagiv Shiv, Menachem Ivcher and Jennifer Ivcher.

161.    Sagiv Shiv received compensation from the Sagam Entities and was paid with the proceeds of Shiv's fraudulent scheme.

162.    Sagiv Shiv received compensation from Sydney Plastics which itself was financially supported by Shiv's fraudulent scheme which provided Sydney Plastics with the benefit of improper transfers and the Pledges. But for the improper transfers and the Pledges, Sydney Plastics would have been financially unable to continue its business and operations and could not have continued to employ and compensate Sagiv Shiv.

163.    Sagiv Shiv directly or indirectly benefitted from Shiv's fraudulent scheme by virtue of his relationship with Shiv.

164.    Menachem Ivcher benefitted from Shiv's fraudulent scheme by virtue of the improper transfers that were made to or for his benefit and his companies' benefit and the Pledges which were made for his and his companies' benefit.

165.    Jennifer Ivcher directly or indirectly benefitted from Shiv's fraudulent scheme by virtue of her relationship with Menachem Ivcher.

166.    Sagiv Shiv, AL Management, Menachem Ivcher, and Jennifer Ivcher are each liable to the Receivership Estate for all liabilities and damages of the Sagam Entities, including on account of the Sagam Entities's liability to the Account Holders resulting from Shiv's fraud, the Sagam Entities' liability stemming from the Pledges of the Sagam/Flame Accounts, and the Receivership Administration Costs.

**WHEREFORE,** the Receiver demands judgment:

    a.    On each Count in an amount to be determined at trial;

    b.    pre-judgment interest in an amount to be determined at trial;

    c.    punitive damages in an amount to be determined at trial.

    d.    costs and disbursements, including reasonable attorneys fees; and

    e.    such other and further relief as this Court deems just and proper.

Dated: New York, New York
       June 9, 2005

                    KAYE SCHOLER LLP

                    By: _____

                    Jay G. Strum (JS 5594)
                    Benjamin Mintz (BM 6060)
                    425 Park Avenue
                    New York, New York  10022
                    (212) 836-8000

                    *Counsel for Arthur Steinberg, the Receiver for Sagam Capital Management Corp., Sagam Captial LLC and Sagam Corp.*